## ASHWORTH v. E. B. BADGER & SONS CO.

Civ. A. No. 2943.

District Court, D. Massachusetts.

Dec. 14, 1945.

William M. Kerwin, of Boston, Mass., for plaintiff.

Thomas H. Mahony, Edmund J. Brandon, U. S. Atty., and Charles E. Cunningham, Asst. U. S. Atty., all of Boston, Mass., for defendant.

FORD, District Judge.

This is an action brought by a former employee of the defendant to recover from it alleged unpaid overtime compensation, for an additional equal amount of liquidated damages, and an attorney's fee pursuant to the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, hereinafter referred to as the "Act".

The defenses now relied upon are: (1) no overtime work performed as alleged by the plaintiff; and (2) exemption of the plaintiff from the provisions of the Act by Section 13(a) (1), 29 U.S.C.A. § 213 (a) (1), in that the plaintiff was employed in a bona fide administrative capacity. In the view that the court takes of the case, it will not be necessary to discuss the first defense.

The Facts.

From March 8, 1943 until June 16, 1944 plaintiff was employed by the defendant as a field inspector the greater part of the time and a part of the time as a field expediter. The evidence clearly showed that the plaintiff was employed on a salary basis of $300 per month plus travelling expenses and that no deduction was made from his salary for absences caused by sickness, holidays, or vacations. In the last few weeks of his employment he was doing inspection work at two of the local shops of the defendant in Cambridge.

Defendant is a Massachusetts corporation with its main offices located in Boston and its manufacturing plants located in Cambridge. During the period of the plaintiff's employment by it, the defendant was engaged in the business of production, engineering, and installation of equipment for oil refining plants, chemical plants, and power plants in this country and abroad.

It is conceded by the defendant (at least for the purposes of this case) that all of the work performed and services rendered by the plaintiff during the period of his employment was in the production of goods for commerce, within the meaning of Section 7(a) of the Act, 29 U.S.C.A. § 207(a).

The defendant had contracts with private corporations and the United States Government to furnish plans for and the component parts of refining and power plants. In order to fulfill these contracts the defendant sub-contracted with pipe fabricators and pressure vessel manufacturers in the various states. These firms, at the defendant's order, fabricated the pipe and manufactured the component parts of the refining and power plants in question. It is with this portion of the defendant's work that we are concerned in this case.

To each of these plants (hereinafter called "vendors") an inspector-expediter

was sent to represent the defendant and follow the order through its different stages of production to determine if plans and specifications were properly met. It was also his duty to speed up the job if it lagged behind schedule. The plaintiff was one of many such inspector-expediters employed by the defendant.

Before the plaintiff here was hired by the defendant he was required to fill out an application which when answered reflected a great deal of experience in engineering and mechanical draftsmanship. It also reflected that he had taken courses in machine design and heating and ventilating at Lowell Institute and Massachusetts University Extension School. Just previous to his employment by the defendant he had been employed by the United States Navy as an Associate Marine Engineer. In his own words (as stated in his application), the nature of his work there was: "Reconciling design plans with specifications, for design, materials and practicability. Inspection and approval of fabricated items and capacities of auxiliaries." It was on the strength of this application the plaintiff was hired.

The plaintiff's duties in his work for the defendant were briefly as follows:

Equipped with plans, specifications and instructions from the Boston office he would proceed to the plant of the vendor in question and present himself as the Badger Inspector assigned to that job. He was then introduced around the plant and familiarized with the plant procedure. Most, if not all, of his assignments were at plants engaged in the fabrication of pipe or the manufacture of pressure vessels. It was his duty to observe the fabrication or assemblage of the product from its initial stage until completion, making frequent checks to see that it conformed to the plans and specifications which he possessed. At times these checks consisted of mere physical measurements; at other times they were merely visual inspections; and, frequently, they involved the observation of hydrostatic or pneumatic tests made by the employees in the particular plant.

If a variation from the plans or specifications appeared he would notify the management or its representative in the plant. If they refused to correct the variation or if they requested that it be allowed to remain, the plaintiff would normally consult the Boston office for instructions as to how to handle it. In any event, if plans or specifications were not met the plaintiff had authority to inform the vendor that the product was not acceptable.

The plaintiff also observed the crating and packaging of the product for foreign shipment. It was his duty to require proper crating and packaging for shipment. He was furnished with a book on crating and packaging by the defendant and was authorized to choose any one of several methods described in the book and instruct the vendor to use it. In one shop, with the aid of a plant foreman, he devised a new method of tying labels on shipments of pipe and instructed the plant to use that method.

If a job moved too slowly, the plaintiff would step in to see what he could do to speed it up. This expedition work included the interviewing of sub-vendors, contacting other Badger inspectors when the trouble was outside his area, and, in general, the use of tact, persuasion and other means to speed up the work upon which a particular vendor was then engaged for the defendant.

The plaintiff's work required a great deal of "paper work". He made daily reports to the Boston office on the progress of the particular job he was inspecting. He advised the Boston office as to what procedures he thought should be followed from time to time and at other times asked their advice. He devised charts to aid him in following a particular job through its various stages and to facilitate his progress reports to the Boston office. He wrote letters to other inspector-expediters and to sub-vendors in his attempts to speed up production of the particular vendor to which he was assigned.

In 1943 the defendant employed the McKinsie Company to make a survey of all its employees for the purpose of reclassifying positions so that the War Labor Board might approve salary increases. The McKinsie Company sent to each employee of the defendant a survey questionnaire concerning their work. This was to be filled in and mailed back to the McKinsie Company. In his questionnaire the plaintiff stated the following:

"I. Description of Your Work

"List carefully your principal duties and responsibilities * * *

"No. 1–Duties primarily involve the inspection and testing of fabricated welded material such as; Piping, Pressure Vessels,

Tanks, etc., for high octane gasoline and synthetic rubber plants.

\*     \*     \*     \*     \*

"No. 3–The object of inspection and testing of this material is: (a) To prevent possible mechanical failure due to faulty material and/or workmanship. (b) To avoid delay in construction of the plant by insuring that each and every component part is constructed in accordance with Plans and Specifications.

"No. 4–In order to accomplish the foregoing it is necessary to (a) Follow the fabrication of each and every piece of equipment, from start to completion. (b) To witness hydrostatic pressure tests. (c) Witness mechanical tests of raw materials and coupons from completed work. (d) Examine manufacturer's mill test reports to determine use of proper material. (e) Inspect welding for acceptance and conformity to specification and/or Code. (f) Complete and sign inspection report for all accepted material, assuming full responsibility for same.

"No. 5–The further duties of this position vary with the actual type of work involved, but include the following: (a) At the beginning of a contract with a new vendor, it is necessary to establish some form of accounting system, by which the progress of the work may be intelligently followed and some order of sequence established. This is arrived at by consulting with the executives of the plant, so that the work of the inspector will harmonize with plant procedure. (b) Progress of the work must be closely followed to insure delivery of completed material when it is needed in the field. Where delays are encountered, their cause is investigated, and everything possible is done to speed up production to avert delays. Constant contact has to be maintained with the Purchasing, Engineering and Production Depts. of the vendor. (c) Divergence from Plans and Specifications during manufacture is usually a matter for the Inspector to analyze, and to use his own judgment regarding rejection or acceptance. In unusual cases, however, final decision is reached after consulting with the Boston Office, Inspection or Purchasing Depts."

In this same questionnaire he also stated the following:

"III. Contacts Outside the Organization

"If your work requires contact or co-operation with individuals outside the Badger organization, describe specifically with whom, by title, the purpose of the contacts and the way the contacts are usually handled, either by mail, phone, or personal interview.

"In setting up for, and performing shop inspection, in various vendor's shops, all executives concerned are consulted. These generally include; Chief Engineer, Chief Draftsman, Production Manager, Superintendent, Shop Foremen, Chief Inspector and Accounting Dept. Purpose of contact is to learn the shop method of the particular vendor involved so that our work may proceed without interference. In the event of errors in fabrication, these individuals are consulted for explanation and adjustment. It is imperative that the inspector has the faculty of retaining the cooperation of these individuals, in order to avoid conflict that might interfere with the progress of his work, and the completion of the contract. These contacts are handled in person.

"Where material shortages develop, it is necessary for the inspector to contact suppliers of the vendor, in order to expedite delivery of the required material. Such contacts are made by personal interview, phone, and letter."

In a later questionnaire for the United States Department of Labor, the plaintiff stated the following:

"7. To what extent does your work require discretion or judgment? 100%

"8. Do you have the power to reject any material which you regard as defective, or of inferior workmanship, or which does not conform to the drawings? Yes."

In the performance of his work on October 16, 1943, the plaintiff wrote in part as follows: "The enclosed letter was secured from Wright-Austin and I believe it is self explanatory. Although it is not backed by a forfeiture bond, I am reasonably certain that they now mean what they say, and can be relied on to complete their promise. Just for some added assurance, I had the penalty clause inserted in the second paragraph of their letter which will serve as a constant lever to jam the job along with in case it does bog down."

In other letters to the defendant the plaintiff made suggestions and recommendations of an administrative character, e. g., increasing the number of inspectors on a job, taking trepans from all vendors, and despatching an inspector with the plain-

tiff to cover the Wright-Austin job in Detroit.

## Discussion.

The defendant argues, in reliance upon Regulation 541.2, subsections (b) (2) and (3),* issued by the Administrator of the Wage and Hour Division of the Department of Labor, the plaintiff is exempt from the provisions of the Act. The plaintiff contends a conclusion should be made that the "administrative capacity" defense is without merit principally because (1) the plaintiff's work is not along specialized or technical lines requiring special training, experience or knowledge; (2) that it does not require or involve the exercise of discretion and independent judgment; and (3) that it is manual.

That the plaintiff's work was along specialized lines requiring special training, experience or knowledge can hardly be doubted. It may be noted that the Regulation does not demand that the work be along both specialized and technical lines. Although it would not be conclusive that the defendant itself regarded that the work required special training or experience, yet it is of considerable importance that the defendant required a substantial amount of specialized training before employing the plaintiff to perform the work involved, and there is no doubt the plaintiff had such training. The very nature of the work involved, as outlined above, indicates clearly the plaintiff's work was along specialized lines since it undoubtedly required special training. It seems clear that one without special training or experience along the lines of the work involved here could not perform the work with any satisfactory degree of accuracy. Of course this essential, i. e., work along specialized lines, it may be noted, is not an essential of (b) (3) of Regulation 541.2, a section which is broader in its scope than (b) (2).

The question whether the work of this plaintiff involved the exercise of discretion and independent judgment presents a problem that is not always free from difficulty. Each case is bottomed on its own facts and since all work requires some exercise of discretion and judgment, a court is met at once with the problem of deciding what the Administrator meant by the words "work * * * which requires discretion and independent judgment" in subsections (b) (2) and (3) and the extent to which the latter essentials must be involved to justify a conclusion an employee is serving in an administrative capacity. Giving the words of the Regulation their natural meaning, an employee possessing the authority to make decisions on his own account without direction or instruction from others may be said to exercise "discretion and independent judgment." Under this test the plaintiff here undoubtedly performed work which required or involved the exercise of discretion and independent judgment. It needs no detailed analysis of the McKinsie Company questionnaire to show this. No one knew better than the plaintiff himself what his work entailed. His relation of its character in this questionnaire is convincing beyond doubt that his work was of an administrative character, and that it embraced all the necessary essentials required by both subsections (b) (2) and (b) (3) of the Regulation. In addition to the description of his work, what he actually did in the field reflects the fact that his work required or involved discretion and independent judgment. His constructed charts to aid him in following the work; his decision to include the penalty clause in the Wright-Austin contract; his decisions with respect to the conformance of the field work to the plans and specifications; the recommendations he made to the home office; the exercise of judgment concerning the safety of the material in foreign shipments; his administrative efforts as to the method to speed up the work, all indicate that the plaintiff exercised his own judgment in his work.

---

* Section 541.2 "Administrative. The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13(a) (1) of the Act shall mean any employee—

* * * * * * * *

"(2) who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

"(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment.

The contention of the plaintiff that his work was merely mechanical is not tenable. It was far more than mechanical; it involved, as stated above, the necessity to make decisions; it was administrative within the meaning of the Regulation. Employees serving in the plaintiff's capacity are more or less on their own in the field, doing important work for the purpose of enabling the defendant's business to function.

The unsupported testimony of the plaintiff that he performed manual labor at times does not aid him. True, he performed some manual labor that was incident to his work but this court cannot find he performed the manual labor he stated he performed at the Bent and Hayward Street Shops of the defendant. Whatever work he was required to do at these shops involved the performance of the same duties he did in the field. It is of no moment he was not always busy with those duties at those shops in the last days of his employment with the defendant and he volunteered to do some manual work. Further, this court cannot find as a fact the plaintiff lifted heavy plates weighing up to 100 pounds at the Bent Street Shop. If he did, he did so on his own account since there were union employees at that shop to perform this work. His work did not require it. The plaintiff's work was essentially nonmanual in every sense of the word. Also this court finds he did not perform the manual labor the plaintiff testified he did at the Hayward Street Shop. No one testified other than himself that he did it and, without going into the detailed evidence, it hardly seems possible in the light of the facts that he would be required to rethread bolts fabricated by other concerns.

In this case there was a tendency on the plaintiff's part to "talk down his job", to avoid the exemption. He attempted to explain away the McKinsie questionnaire as an attempt to "boost" his job for the purpose of more salary. The court cannot accept this latter explanation especially since the answers in the questionnaire were in line with the oral credible evidence adduced by the other witnesses with respect to the duties the work required. This evidence showed the plaintiff's work was substantially as the plaintiff himself described it in the questionnaire.

It needs no argument to demonstrate that the essentials in Section (b) (2) of the Regulation, that the employee perform responsible field work under only general supervision directly related to general business operations, are present in the work the plaintiff performed as is also the requirement in Section (b) (3) that the work involve the execution of special assignments.

### Conclusions of Law.

Since the plaintiff was employed by the defendant in a bona fide administrative capacity within the meaning of Section 13 (a) (1) of the Act and Regulation 541.2, (b) (2) and (b) (3), the provisions of Section 7 (a) of the Act, 29 U.S.C.A. § 207 (a), do not apply to him and he cannot recover in this suit.

Judgment will be entered for the defendant without costs.