Edward **GENTILE**, Plaintiff,

v.

**HOLLY CORPORATION**, Defendant.

Civ. No. 6638.

United States District Court
D. Connecticut.

July 19, 1960.

Margaret Connors Driscoll, Bridgeport, Conn., for plaintiff.

Charles W. Page, of Day, Berry & Howard, Hartford, Conn., for defendant.

CLARK, Circuit Judge (sitting as District Judge pursuant to statutory designation).

In this action plaintiff seeks recovery from his former employer, Holly Corporation, of overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., and also under the terms of an alleged oral agreement. Jurisdiction is based upon the federal statute, 28 U.S.C. § 1337, 29 U.S.C. § 216(b); further the parties have diverse citizenship, plaintiff being a resident of Connecticut, while defendant is a Delaware corporation.

Plaintiff was employed from October 1955 to March 1957 at defendant's manufacturing plant located in Pine Meadow, Connecticut. The plant carried on operations both as the Pine Meadow Division of Holly Corporation and as Amcoin Corporation, a wholly owned subsidiary of Holly. During the period of plaintiff's employment the plant was engaged principally in the production of the Amcoin urn, a commercial coffee urn, of which a major purchaser was the United States Army Quartermaster Corps. Defendant's plant manager, Merrill W. Hill, initially offered plaintiff employment as a salesman; but this position became unavailable so that plaintiff was assigned to the stockroom at a wage rate of $1.50 an hour ($60 per week). In December 1955 he was given a new position on a salary basis of $115.38 per week or $6,000 per year. Thereafter plaintiff's salary was increased in March 1956 to $125 per week or $6,500 per year, in October 1956 to $135 per week or $7,020 per year, and in December 1956 to $144.23 per week or $7,500 per year. These amounts were duly paid as the services were rendered; the present claim is for overtime compensation in the amount of $7,024.82, together with liquidated damages of like amount, attorney's fees, and costs.

## The Claim under the Fair Labor Standards Act

There is no dispute as to the fact that defendant was engaged in interstate commerce and was subject to the wage and hour provisions of the FLSA. It is claimed, however, that plaintiff was employed in an executive or administrative capacity and thus was exempt from the overtime provisions of the Act. In granting this exemption Congress has not defined executive or administrative status, but has delegated this task to the Administrator of the Wage and Hour Division of the Department of Labor. 29 U.S.C. § 213. The administrative regulations prescribe six requirements for the executive exemption and five requirements for the administrative exemption. 29 U.S.C. App. §§ 541.1, 541.2. But each section also contains a so-called "white-collar" proviso under which an employee "who is compensated on a salary basis at a rate of not less than $100 per week" is deemed to fulfill a number of these requirements.[1] Since this action involves only the period of employment subsequent to December 1955, plaintiff's compensation at all times exceeded the $100-per-week minimum.

The thus applicable regulation defines an executive employee as one "whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein * * *." 29 U.S.C. App. § 541.1. An administrative employee is defined as one "whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer * * * which includes work requiring the exercise of discretion and independent judgment * * *." 29 U.S.C.App. § 541.2.

The dispute between the parties primarily involves the factual nature of plaintiff's duties, rather than the appli-

---

1. The amount has been increased to $125 per week by amendment effective Feb. 2, 1959. 23 Fed.Reg. 8962; 29 U.S.C. App. §§ 541.1, 541.2 as amended.

cation of the above definitions. Plaintiff's witnesses portrayed him as filling in where needed and performing such manual tasks as trucking parts, tools, and materials in order to keep the production workers supplied; inspecting, polishing, and crating urns; lending assistance on the assembly line; acting as an "errand boy" in transmitting orders and production schedules from Hill to the various departments; filling the soft-drink machine; and picking up rags. It was variously estimated that he devoted 70 to 90 per cent of his time performing such manual endeavors. In contrast, defendant's witnesses pictured plaintiff as the "plant superintendent" or "production manager" who, subject only to Hill, exercised authority over all phases of plant operations and who spent little, if any, time engaged in manual tasks.

While both these accounts appear exaggerated, the court concludes that defendant's portrayal is the more nearly accurate. It is unlikely that plaintiff was receiving a salary of $6,000 to $7,500 a year for work which did not materially differ from that which he was performing as a stockroom employee at a wage of $3,120 a year. And there is little dispute that plaintiff's position was designated, at least nominally, "plant superintendent" or "production manager." Although there is vigorous dispute as to plaintiff's authority over other employees, there is no evidence that he received orders from anyone else than Hill, who on cross-examination described plaintiff's position as that of a "troubleshooting expediter." The evidence as a whole strongly suggests that plaintiff's primary duties were concerned with production scheduling and expediting. This included such assignments as scheduling and controlling production, organizing and apportioning work, and analyzing and remedying assembly problems. The position also required maintaining liaison among, and integrating the efforts of, the various departments, as well as maintaining contact with the New York sales office in matters relating to order scheduling. These activities, although performed under Hill's general supervision, involved the exercise of discretion and independent judgment.

The court is also convinced that the major portion of plaintiff's time was expended in such nonmanual duties. The often chaotic conditions at the plant, caused by such factors as rehabilitation following flood damage, unfamiliarity of employees with the manufacture of the Amcoin urn, inadequate working capital, shortage of materials, and fluctuation in the number of employees from 30 to 80 or more persons, were reflected in frequent delays in filling orders. Under these circumstances all employees, including Hill and plaintiff, would, whenever possible, lend assistance where needed. But such manual tasks were merely collateral to plaintiff's primary duties and occupied considerably less than one-half of his time.

Thus the picture of his activities and position set forth by the defendant's witnesses carries more conviction than that offered by the plaintiff and his witnesses; and there are various bits of corroborating evidence which likewise fit the defense contention and are incongruous with the contrary view. So Hill, plaintiff's star witness, testified, "We had a desk set up for him in the office on the second floor with an amplifying telephone." If plaintiff was a mere errand boy he would hardly have been given means of addressing the workers during their work. Again it appeared that plaintiff was in full charge of the plant operations and the 60 or so workers when Hill was away, on jobs or sales or at the New York office, as he had to be some 25 to 30 per cent of the time. And there are other telltale flags, which help to convince the court that any conflicts in the testimony—due perhaps to the natural exaggerations of self-interest more than deliberate fabrication—must be resolved in the defendant's favor.

This evidence has been considered chiefly on the point of plaintiff's employment in an administrative capacity, but has bearing also upon the companion issue of executive capacity. In-

deed, there is much to suggest that plaintiff exercised executive supervision over production personnel. Since, however, the above findings compel the conclusion that he at least qualified as an administrative employee, it is unnecessary to determine whether he occupied an executive status. While each case in this area must turn upon its particular facts, the following decisions have held employees somewhat similarly situated to be exempt: Wells v. Radio Corp. of America, D.C.S.D.N.Y., 77 F.Supp. 964, 971–972; Anderson v. Federal Cartridge Corp., D.C.Minn., 72 F.Supp. 639, 642; Dolan v. Day & Zimmerman, Inc., D.C.Mass., 65 F.Supp. 923, 936; Ashworth v. E. B. Badger & Sons Co., D.C.Mass., 63 F. Supp. 710. See also Stanger v. Glenn L. Martin Co., D.C.Md., 56 F.Supp. 163. Thus plaintiff, as an exempt employee, cannot prevail in his claim under the Fair Labor Standards Act.

This conclusion makes unnecessary findings upon overtime work and its definite amount. The court is constrained to say, however, that, while it seems apparent that plaintiff did work evenings and after hours to some extent, yet it appears that the amounts have been sharply exaggerated and there is no convincing evidence to show what these were. Introduced in evidence was the plaintiff's tabulation showing that he worked overtime during 1956 and early 1957 quite regularly 20 or more hours per week and sometimes as much as 45 or 53 hours. This information he claimed to have recorded in a number of diaries, only one of which he produced. He testified that the defendant never had any record of the overtime, although Hill, as his witness, said that the company did have such records—a statement defendant denied. At any rate we have only plaintiff's analysis of his work in these rather fantastic amounts. His testimony showed that much of the time he was alone on these night engagements. There was other testimony that often this was a meeting for general talk ranging from work gripes to taxes and women. It seems apparent that not all this time

could have been used profitably in merely laying out the next day's work. Accordingly it is questionable whether plaintiff has sustained his burden of proof as to the amount of overtime work.

### The Claim upon Express Contract

■ The second cause of action alleges an oral agreement under which plaintiff was to be compensated for overtime when the company became financially able to pay. Plaintiff testified that when he was placed on a salary basis in December 1955 Hill stated that the company was not then in a position to pay overtime and promised that such compensation would be paid as soon as the company was able to do so. This testimony was supported by that of Hill, who added that he had mentioned the agreement to Chiusano and Fischer, vice-presidents of defendant, and Smither, an officer of Amcoin Corporation, at a meeting in New York City and that Fischer had approved it. Chiusano, at that time vice-president in charge of defendant's industrial and manufacturing division, testified that no such discussion had occurred and that Fischer, then treasurer and vice-president in charge of defendant's oil and mineral division and now deceased, would not have had authority to approve such an agreement without his concurrence.

Hill also testified that in November 1956 he discussed the agreement with Thomas Harris. Harris, brother of S. B. Harris, Jr., defendant's president, spent the fall of 1956 at the Pine Meadow plant in a consulting capacity and in January 1957 became a vice-president of defendant and president of Amcoin Corporation. Plaintiff and Hill also testified that in December 1956 Thomas Harris stated that the Quartermaster contract was progressing satisfactorily and that upon its completion the company would be in a position to pay the overtime due plaintiff. Harris, however, testified that he was never informed of any overtime arrangement, that he made no such promise, and that it was apparent in December 1956 that the company would suffer a substantial loss on the Quartermaster contract. The evidence at the trial es-

tablished that such a loss was in fact incurred, although plaintiff now relies upon defendant's consolidated income statement for the fiscal year ending July 31, 1957, as proof of its ability to pay.

In evaluating this conflicting evidence it seems a natural premise, as Harris testified, that the usual industrial practice is to compensate management personnel on a straight salary basis and that the amount of work performed by such an employee is considered in granting salary increases. As to whether or not such practice was here followed, a comparison of plaintiff's salary with that of Hill is enlightening. Hill's salary was $153.85 per week at the time he increased plaintiff's salary to $135 per week. Under the alleged agreement, therefore, plaintiff would receive $155.25 for a 44-hour week or $236.25 for a 60-hour week.[2] Since Hill could be expected to work longer than a 40-hour week, his testimony would indicate that he promised plaintiff greater compensation than he himself received. This anomaly is compounded when viewed in the light of Hill's description of plaintiff as "not much more than" an "errand boy."

Plaintiff's reflection upon his efforts expended in defendant's employ, including the vast number of overtime hours claimed, in conjunction with his dismissal by Harris, might well have given rise to the belief that he deserved additional compensation. Hill of course indicated his complete satisfaction with plaintiff's work as well as a feeling that plaintiff's salary was inadequate compensation therefor. There was testimony by Harris, however, that he requested Hill's resignation because of what he considered to be evidence of plant mismanagement, although Hill testified that he voluntarily resigned for health reasons. Quite obviously there was warm feeling against the present management disclosed at the trial on the part of plaintiff and Hill, who made himself plaintiff's partisan.[3] The court notes that it has felt constrained to resolve doubts as to the FLSA claim against the general tenor of the plaintiff's and Hill's testimony, and like considerations apply here. Under the circumstances it is perhaps to be expected that the passage of time and recollection of assumed hard treatment may have led these witnesses now to recall a more precise and binding agreement than the general words of encouragement justified.

A basic difficulty with the plaintiff's case is the unreality of these relatively large claims, putting his compensation higher than the plant manager himself, as against a plant which had been having physical and financial difficulties and which was now hard pressed to complete a burdensome contract. While words of hope to be fulfilled when a better day came are perhaps not unnatural, yet it was surely highly unlikely that such unique promises for this one employee would be made in any binding way. Had they been so made it would have suggested incapable management and might well have presented issues of authorization which the court has not found it necessary to consider. Further there is a factual inconsistency between the plaintiff's two claims; for under the first he has to contend that he is a mere errand boy doing "buggy-lugging," while under the second he is the highest priced official in the plant. The second, too, appears to have been somewhat of an afterthought. He was discharged in March 1957 and intervened in September 1957 in a pending action for overtime compensation brought by his brother and another employee; not until March 1959 did he make the claim of special contract by amendment to his complaint. The net result is that the plaintiff has failed

---

2. In December 1956 when plaintiff's salary was increased these figures would become $165.86 and $252.40 respectively. At that time Hill was receiving "two hundred eight something" per week.

3. No weight, however, has been accorded testimony offered by defendant attacking Hill's reputation in the community for veracity, for the proffered testimony appears to be of an inconsequential character.

to establish the alleged contract, just as he has failed to prove his FLSA claim.

The clerk is directed to enter judgment forthwith for the defendant. This memorandum of decision constitutes the court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52 (a).