**DOLAN et al. v. DAY & ZIMMERMAN, Inc., et al.**

**MARTIN et al. v. SAME.**

Civil Actions Nos. 2357, 2494.

District Court, D. Massachusetts.

April 18, 1946.

Vernon C. Stoneman, Francis X. Hurley, and Harold Wax, all of Boston, Mass., for plaintiffs.

Edward Geremia, of Providence, R. I., for defendant Precision Mfg. Corp.

O. M. Shaw, Edward B. Hanify, and Ropes, Gray, Best, Coolidge & Rugg, all of Boston, Mass., for defendant Day & Zimmerman, Inc.

Charles S. Maddock, of Boston, Mass., for National Shawmut Bank, alleged trustee of Precision Mfg. Corporation and Precision Manufacturing Corporation.

Edmund J. Brandon, U. S. Atty., and Charles E. Cunningham, Asst. U. S. Atty., both of Boston, Mass. (Hinckley, Allen, Tillinghast & Wheeler and Isadore Paisner, all of Providence, R. I., of counsel), for Precision Mfg. Co.

Alfred S. Sherwin, of Fall River, Mass., for Skelley Detective Service, Inc.

John M. Russell, of Boston, Mass., for defendant Day & Zimmerman, Inc.

Lon L. Fuller, Edward B. Hanify, and Ropes, Gray, Best, Coolidge & Rugg, all of

Boston, Mass., for defendant Day and Zimmerman, Inc., in No. 2494.

Edward Geremia, Hinckley, Allen, Tillinghast & Wheeler, and Isadore Paisner, all of Providence, R. I., for defendant Precision Mfg. Co. in No. 2494.

FORD, District Judge.

These two suits, consolidated for trial, are brought under Section 16(b) of the Fair Labor Standards Act of 1938, 29 U. S.C.A. § 216(b), hereinafter referred to as the Act, to recover alleged unpaid overtime compensation, liquidated damages, and attorney's fee.

Because witnesses were located in various parts of the country and because of the expected length of the trial (actually the whole or part of seventy days), the court, at the request of the parties, referred the case to a special master who has filed his report.

Objections to the report have been filed by the plaintiffs and the defendants and, in the main, the respective parties move that the report be confirmed where the findings and rulings are in favor, and modified or rejected where the findings and rulings are adverse.

The plaintiffs' objections number 144 and for the most part may be summarized as follows: (1) The master's findings as to the regular workweeks of the plaintiffs who the master found were entitled to recover are clearly erroneous; (2) the master's computations of overtime are wrong; and (3) his findings as to those employees who were found to be exempt under the Act are also clearly erroneous. The defendant Precision Manufacturing Corporation (hereinafter called Precision), for the most part, objects to the master's findings that certain of the planning engineers and assistant buyers were allowed to recover. The objections of Day & Zimmerman, Inc., defendant, are specifically directed to the master's finding that it was an "employer," within the meaning of the Act, of the plaintiffs who were allowed to recover.

A brief summary of the master's report concerning the project in which the plaintiffs were employed will be necessary. The Excel Foundry & Machine Company, Inc. (hereinafter called Excel), in 1941, entered into a "cost-plus" contract with the United States to manufacture torpedoes for the British under lend-lease arrangements. In March, 1942, Excel organized Precision as a result of an arrangement with Day & Zimmerman, Inc., and all Precision's issued shares of stock went to Excel. Precision was organized for the express purpose of performing all work with respect to the construction of the torpedoes which were to be constructed in accordance with British specifications. To build the intricate mechanism of these torpedoes required a high degree of mechanical skill. The master found great efforts were required searching out men who possessed such technical skill. Many intricate special jigs, gauges, and fixtures were required. Training programs for male and female workers were undertaken. Great manufacturing difficulties were encountered. Manufacturing from British specifications compelled a considerable part of the Precision organization to search for outside sources that could manufacture the necessary tools and parts. The master found that many of Precision's employees were compelled to pursue specialized assignments in their work.

### Objections of Defendant Day & Zimmerman, Inc.

On March 2, 1942, a management contract was entered into by Excel and the defendant Day & Zimmerman, Inc. (hereinafter sometimes called D & Z). On June 4, 1942, an agreement supplemental to the management contract was made by Excel, Precision, and Day & Zimmerman, Inc. Under the arrangements made, D & Z was to receive for its services 45% of the net fee in the torpedo contract and 50% of the net fee for the manufacture or assembling hereafter of torpedoes under any other "cost-plus" order or contract. Article II of the supplemental agreement provided that "The new company's (Precision) directors shall be seven in number, five of whom shall be designated by Day & Zimmerman." George M. Vesselago, of the firm of D & Z, became president of Precision in March, 1942, and remained

there to set up the departments and sub-departments of Precision and appoint department heads. Mr. Vesselago was succeeded by Leonard L. Stanley, vice-president of D & Z. Five of D & Z's board of directors were elected directors of Precision in 1942. Mr. Vesselago in 1942 established the policy of Precision as to personnel, salary and wage levels. The master found that Mr. Vesselago in all he did while president of Precision acted in the interest of D & Z and the master further found "by and through its majority representation on the Board of Directors of Precision, and by its designation and.. controls of department heads and key personnel at Precision, did effectively manage and control the operations at Precision." He further found that "there was no circumstance in all the evidence before me that would indicate any opposition to, or interference with, the effective direction of Precision affairs by Day and Zimmerman, Inc."

On these findings of the master, which are clearly supported by the evidence, it can hardly be contended seriously that D & Z was not, as Precision, an "employer" of the plaintiffs within the meaning of the Act. An employer is defined in Section 3 (d) of the Act, 29 U.S.C.A. § 203(d), as follows: "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *." Certainly D & Z was acting directly for Precision who no one disputes was an employer. And from the facts it clearly appears that D & Z was, through its control of the board of directors, actually in control of the internal management of Precision. Cf. Reconstruction Finance Corp. v. Maryfield, 1 Cir., 134 F.2d 988, 992. Even if we adopt the extreme view expressed in Bowman v. Pace Co., 5 Cir., 119 F.2d 858, 860 and Maddox v. Jones, D. C., 42 F.Supp. 35, 41 that the Act did not intend to create new wage liabilities or to change the familiar rules laid down for the determination of the employer-employee relationship, we do have here a situation that directly fits into the traditional concept of that relationship. D & Z, through its control of the board of directors, without question directed the internal manage-ment of Precision, fixed the salaries and wage levels of its employees, and retained the right to control and direct the work of Precision's employees and the details and means by which the results were to be accomplished by the work to be performed. As further evidence of the close relationship of D & Z to Precision, it may be pointed out that the master found, warrantably, that the torpedoes manufactured by Precision and forms used in connection with the work there bore the mark "D Z" or "D and Z". It is obvious these letters meant Day & Zimmerman, Inc. The record is replete with evidence tending to prove D & Z was in complete control of the affairs of Precision and this is understandable when it is noted that D & Z was to receive such a substantial share of the net profits of Precision.

Further, looking at the definition of "employer" in the Act, I do not share the view expressed in some cases that Congress had in mind the common-law concept of that term. See Walling v. Merchants Police Service, Inc., D.C., 59 F. Supp. 873, 875; cf. National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 120, 124, 64 S.Ct. 851, 88 L. Ed. 1170. The phrase "acting directly or indirectly in the interest of an employer in relation to an employee" is not meaningless. Congress must have had in mind, in passing an act so remedial in its nature and in using the language it did, cases other than those involving a technical definition of employer and employee. The present case I believe falls squarely within the meaning of "employer" as Congress employed the term. The Supreme Court stated in National Labor Relations Board v. Hearst Publications, Inc., supra, 322 U. S. at page 125, 64 S.Ct. at page 857, 88 L. Ed. 1170, a National Labor Relations Act, 29 U.S.C.A. § 151 et seq., case holding newsboys to be "employees" under the definition set forth in that Act: "It will not do, for deciding this question as one of uniform national application, to import wholesale the traditional common-law * * * variations as exclusively controlling limitations upon the scope of the statute's effectiveness. To do this would be merely to select some of the local, hair-

line variations for nation-wide application and thus to reject others for coverage under the Act. That result hardly would be consistent with the statute's broad terms and purposes." This language is likewise applicable in determining the meaning of "employer" in the Fair Labor Standards Act. Cf. Walling v. Wolff, et al., D.C., 63 F.Supp. 605; Walling v. Atlantic Greyhound Corp., D.C., 61 F.Supp. 992; Walling v. Twyeffort, Inc., D.C.S.D.N.Y., 65 F.Supp. 614.

As a matter of fact and law the master was correct in determining the defendant D & Z was an "employer" of the plaintiffs along with Precision.

This brings us to the plaintiffs' objections and the findings of the master as respects the question whether any of the plaintiffs were exempted from the provisions of the Act on the ground that they were employed in a bona fide executive, administrative, or professional capacity within the meaning of Section 13 (a) (1) of the Act, 29 U.S.C.A. § 213 (a) (1), and the regulations laid down by the administrator defining those terms. 29 U.S.C.A. Appendix, Rules and Regulations, F.L.S.A. Part 541. The master found that certain of the plaintiffs fell within the exemption and excluded them from the benefits of the Act, 29 U.S.C.A. § 201 et seq. Some of the employees can be dealt with in groups and others, performing special tasks, will be dealt with individually.

## The Planning Engineers.

The master found that Precision's operations were to a considerable extent assembling operations; that the manufacturing of tools and parts was to a large extent subcontracted for or placed with outside vendors. Technical skills of a high order were necessary to build the intricate mechanisms and the organization was built from the ground up. A great deal of attention had to be devoted to coordination and correlation and these duties were assigned to the planning and forecasting department and to men who, to a large extent, were called "planning engineers." Each planning engineer was assigned a particular section of the torpedo. All were employed on a salary basis of not less than $200 per month. It was necessary for each to be familiar with the status of the tools and parts necessary to complete the assigned section.

In the manufacture of a torpedo some 1500 or 1600 varied items were required. The aggregate number of parts used in each torpedo was about 5000. Many thousands of special and perishable tools were required to produce those parts. The tooling design was handled by the engineering department and at the outset planning was tied in with engineering and the planning work was a part of the general engineering department. Later the planning work was placed in the production department and the master found these planning engineers, so-called, were coordinators with about 300 items or parts assigned to each. These 300 items made up a section of the torpedo. The master found it was the task of each planning engineer to follow the items assigned to him from the initial start of the material and tools through to the completion of the torpedo. He was given a time schedule for the items assigned to him and it was his duty to see that the schedule was met; to inform management of delays with reasons for the delays and recommend steps to overcome delays and difficulties in meeting time schedules. The employee maintained a running record showing the status of each assigned item, all for the purpose of having parts ready for the assembly so that production would not be held up. His duties required intelligence and some mechanical knowledge and the ability to keep adequate records. A planning engineer made no final decision on methods employed.

The government, defending for Precision, argues that with the exception of one employee in this group (McLaughlin) the plaintiffs, Bacon, Heilpern, Wentworth, Lohman, Busch, and Brush were employed in an administrative capacity within the meaning of the Act and were exempted from its provisions. The master, in addition to a general finding that planning engineers performing the duties outlined above were not serving in an administrative capacity, made specific findings concerning each of the above-named employees.

■ He found *Bacon* was entitled to overtime compensation for part of the period in question, i.e., October 19, 1942, to February 22, 1943, and found him to be employed in an administrative capacity when, on or about February 22, 1943, the Waterbury Clock Company (now U.S. Time Corp.) took over the production of the gyroscope as a prime contractor rather than subcontractor and Bacon, at an increased rate of pay, i.e., from $60 to $70 a week, was assigned as liaison officer between the company and Precision. The master found that the scope of Bacon's work increased greatly and he was a key man in coordinating the details connected with the transfer of operations from Precision to the Waterbury Clock Company. The master was correct in classifying Bacon as an administrative employee on and after February 22, 1943.

*McLaughlin, Heilpern,* and *Wentworth* were found not to be within any of the exempted classes and entitled to overtime during the term of their employment.

■ *Lohman.* This employee was allowed overtime while employed as an assistant planning engineer from August 17, 1942, to October 17, 1942. On the latter date he became a group leader, supervised a group of employees working under his direction, executed their rating reports, and attended staff meetings with Precision executives. He also conferred with representatives of the U. S. Navy and the British Admiralty after October 17, 1942. No overtime compensation was allowed to this employee after October 17, 1942. There is no question that after Lohman became a group leader he was an executive employee under the Act.

■ *Busch.* This employee was included in the group with planning engineers from April 1, 1942, until June 27, 1942, and was employed as junior draftsman and carried on the payroll of the planning and forecasting department. On June 29, 1942, this employee's salary was increased from a weekly rate of $60 to $70 and on November 16, 1942, his salary was increased to $75 per week. The master found on this date Busch became a group leader and the duties of such will be further described later when foremen or group leaders are specifically discussed. As a group leader, and as the facts showed, in close association with Mr. James P. Brush, who became chief industrial engineer on February 15, 1943, this employee was employed in an executive capacity. On June 3, 1943, this employee used the title "assistant chief industrial engineer." The master properly classified him in an exempt class. The fact that this employee did some routine work incidental to his duties as an executive employee does not take him out of the latter class.

■ *Brush.* No overtime was allowed this employee. After February 15, 1943, Mr. Brush was chief industrial engineer and waived any claim to overtime after that date. He was paid $100 per week and in charge of the planning and forecasting department. Brush was an assistant to the chief industrial engineer from the date of his employment, April 1, 1942, to February 15, 1943. The finding of the master that as an assistant to a bona fide executive, he was an administrative employee from April 1, 1942, to February 15, 1943, must be affirmed.

■ All the objections of the plaintiffs and the government with respect to the employees dealt with under the "planning engineers" group are overruled. Although this court regards this group as close to the administrative exemption, yet in no case where the master has made a finding with respect to the group can it be successfully asserted that the master is clearly erroneous. Rule 53 (e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

## Assistant Buyers.

■ These plaintiffs worked outside the Precision shops and had no authority to buy anything. They characterized themselves as "errand boys" after the usual pattern in cases under the Act, but they were far more than "errand boys." Though the evidence reflects as respects the outside buyer some exercise of discretion and independent judgment in searching and checking manufacturers who might supply tools, jigs, and gauges, and re-

porting complaints with recommendations, on the whole, I believe the master was correct in allowing overtime to the outside buyers where they were engaged solely in contacting vendors to interest the latter in submitting bids for the tools that were outlined in blueprints supplied to these outside assistant buyers. As stated, these buyers had no authority to accept bids.

*Walter S. Dolan.* An assistant outside buyer from August 10, 1942, to June 7, 1943; overtime allowed. From June 7, 1943, to June 26, 1943, this employee acted as a group leader in charge of the section for the purchase of tools, jigs, fixtures, and gauges. In this latter position he exercised a great deal of discretion and independent judgment. From June 7, 1943, to June 26, 1943, the master found he was employed in an administrative capacity and disallowed any overtime. I believe this finding cannot be said to be clearly against the weight of the evidence. Cf. Fleming v. Palmer et al., 1 Cir., 123 F.2d 749. As respects this employee, the master found that while a group leader he carried on his duties as an assistant buyer. Counsel argues that this prevented him from becoming an administrative employee. I do not agree. These buyers exercised some discretion and independent judgment as buyers. The master found it was not enough to exempt them. I believe an employee may be entitled to overtime benefits where under the "administrative" definition he fulfills every requirement to make him exempt except that his work does not require him to exercise sufficient discretion and independent judgment and then become exempt when his added work requires such additional exercise of discretion and independent judgment that a finder of fact would regard him as exercising such a substantial amount of discretion and independent judgment as to sweep him within the intendment of the "administrative" definition.

*Bernard J. Keane.* An assistant outside buyer during his employment with Precision and overtime allowed by the master for the whole period. This finding, not disputed by the plaintiff or the government, was correct.

*Ernest R. Doyle.* An inside assistant buyer from May 4, 1942, to June 26, 1943, in the procurement department. This employee, the master found, exercised broader functions than buyers Dolan or Keane. He was a buyer of catalogue tools of standard size and also a buyer of special tools and practically all his work was carried on inside the Precision shop by use of the telephone. He carried on his duties as a buyer subject only to the general supervision of the head of the procurement department. These duties Mr. Doyle carried on from June 15, 1942, to June 26, 1943, at a salary of $70 per week. The master found that Doyle during this period was employed in an administrative capacity. His work fulfilled all the requirements of the administrator's definition; it was plain his work required a marked degree of discretion and independent judgment. This was evidenced in the testimony of Charles H. Hartly, a tool manufacturer. He was, as the master found, not entitled to overtime during the period set out. From May 4, 1942, to June 15, 1942, the master allowed overtime to the employee on the finding that during this short period before his increase of pay to $70 per week he performed the duties of an inside buyer that did not require any substantial exercise of discretion and independent judgment. I cannot say the master was clearly erroneous in this finding.

*Earl R. Hasney.* An assistant buyer. The master disallowed overtime for this employee for the period beginning June 13, 1942, to October 31, 1942, on the ground his duties during this period were similar to those of Doyle, supra. He signed, as Doyle did, purchase orders for tools. Although the master made no specific finding with respect to his falling within the administrative exemption during that period, I find and rule he was performing duties similar to Doyle during the critical period, was subject only to general supervision, and exempted from the overtime provisions of the Act.

*John H. Barlow.* An assistant buyer. Overtime allowed by the master on ground work was essentially clerical; this finding is correct.

*William E. Kerrish.* An assistant buyer with a salary of $50 per week from June 30, 1942, until October 12, 1942. From October 12, 1942, to June 26, 1943, his salary was $60 per week. Overtime allowed up to October 12, 1942, when employee's position was changed from assistant buyer to assistant expediter in the procurement department. He then did internal expediting and carried out a number of special assignments. He became contact man for Precision in relation to the inspection division of the British Admiralty. He testified himself: "It was a kind of a little diplomatic job * * *." This employee did little buying though classified as an assistant buyer up to October 12, 1942. This employee was also a liaison man and worked as a special assistant to the director of procurement. The master found he was exempt as an administrative employee from October 12, 1942 to the end of his employment, June 26, 1943. The finding is correct.

*Anthony J. LeBeau.* An assistant buyer and internal expediter; overtime allowed for whole period of employment. This finding was correct.

*Raymond W. Parlin.* This employee held an "Sc.B." in engineering from Brown University and taught the subject for a year after graduation. He began work at Precision on April 30, 1942 as assistant tool buyer in procurement department at $60 per week. From July 6, 1942, to March 15, 1943, he was paid $70 per week and assigned to the procurement department. The master found Parlin's work at Precision could be described as "tool engineering." At all times during his employment this employee assisted an employee in a bona fide administrative capacity, the assistance was nonmanual and required the exercise of discretion and independent judgment. The master found this employee served in an administrative capacity and was exempted from the benefits of the Act. The finding is correct.

Expediters and Assistant Expediters.

Those in this class were allowed overtime and the master's findings in allowing overtime are not now challenged by the government. These men were essentially contact men, observers, purveyors of information. They had no technical responsibilities. They reported progress on parts in process with outside vendors. The work required no exercise of discretion or independent judgment. The master's findings are correct.

Foremen and Assistant Foremen.

The master found there was a general foreman for each floor of the production department of Precision. Assembly groups for the torpedo were arranged. Each assembly group was composed of a number of employees who worked directly under a foreman group leader. These leaders made out and signed rating reports upon the employees under their charge. They selected the men to be laid off and made recommendations for discharges. They assigned the work to be done by the machinists and others under their charge and were immediately responsible for the progress of the mechanical work of the Precision shop. They supervised and instructed the employees assigned to the section under their charge. At times certain foremen group leaders did some mechanical work in aid of production. This work was done for the purpose of manually instructing the men employed under these group leaders.

Foremen group leaders *Arthur H. Mahy, Francis R. Platt, Ludger J. Dionne, Victor E. Martin,* and *Walter C. Ryder,* were denied overtime by the master on the ground they were employed in a bona fide executive capacity and with respect to the above-named men the master found they did not devote more than 20% of *their* time to work of the same nature as that performed by nonexempt employees under their direction. I do not share the master's view in his interpretation of the administrator's regulation with respect to "executive" capacity. Subdv. (f) of Regulation § 541.1, Executive. An "executive" is defined by the administrator among other things in subdivision (f) as: "whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction

* * *." The nonexempt work referred to in the regulation is not only the type of nonexempt work performed by employees under the direction of the employee in question. It is nonexempt work of any nature. Also it is not 20% of the employee's time that is referred to in the regulation; the base upon which the percentage is to be taken is the hours worked in the workweek by *the nonexempt employees under the direction* of the employee.

The master has apparently misinterpreted the regulation and there is necessity, in accordance with the plaintiffs' contentions, for a finding of fact with respect to the requirement contained in subdivision (f) of the regulation. This court upon a review of all the evidence before the master with respect to this issue finds that the defendant Precision has carried its burden of proving as a fact that no one of the employees named performed work of the same nature as that performed by non-exempt employees which exceeded 20% of the number of hours worked in the workweeks in question by the nonexempt employees under their direction.

Further with respect to these foremen group leaders, whatever manual work these men did, as the master found, and correctly, was for the most part in their supervisory capacity. They attempted to convince the master that they exercised little supervision; that all or most of their time was spent performing work of the same nature as the nonexempt employees under their direction. On cross examination they conceded that part of the time was spent supervising employees. The testimony of these men was unreliable. The master had an opportunity to pass on their credibility and undoubtedly he disregarded most of their testimony concerning work they performed of the same nature as that performed by the nonexempt employees. The pattern of their testimony as a whole was to the effect that they actually performed nonexempt work for the greater part of their time and the rest of their time was spent keeping records. Their portrayal of their duties left little time for them to perform what they were employed for, i.e., direction and supervision of the employees under them. In their ef-

fort to avoid the exemption they put themselves in such a position that their evidence taxed credulity. On the other hand a different picture was presented by other executives of Precision, such as one Burns, a dispatcher of work in the machine shop where foreman Ryder worked, and production manager Thornet, who testified none of these foremen group leaders did any manual work after their period of training was over except when occasionally he demonstrated how the work was to be done or helped a nonexempt employee out of a difficult situation. The master believed Burns and Thornet. After a review of the evidence the court finds that the foremen named above (Mahy, Platt, Dionne, Martin, and Ryder) did not work at nonexempt tasks for a period of time that exceeded 20% of the hours of the nonexempt employees under their direction.

As respects employee *Harold A. Bassett,* a tinsmith by trade, who started his employment with Precision April 24, 1942, as a machine operator and was changed to a foreman group leader on October 12, 1942 at a salary of $70 per week, the master again fell into error with respect to a proper construction of subdivision (f) of "executive" regulation. He found that for a definite period (October 12, 1942 to January 16, 1943) "more than 20% of Bassett's workweeks were devoted to manual work of the same general nature as that performed by nonexempt employees under his direction" and allowed overtime. There is no need of an order of recommittal for the master to make a finding with respect to requirement (f) of the regulation. It plainly appears from the evidence that before Bassett assumed his duties as foreman group leader on October 12, 1942, and after, up to January 16, 1943, he performed work of the same nature as that performed by nonexempt employees for more than 20% of the number of hours worked in the workweeks by the nonexempt employees under his direction. Thus he was entitled to overtime. It is also apparent from the evidence that during the period from January 16, 1943, to the completion of his employment, the defendants sustained their burden of proving requirement (f) and the other requirements of the "executive"

regulation with respect to this foreman group leader. In this latter period Bassett was employed as a bona fide executive and not entitled to overtime compensation.

 *Stephen J. Magill.* This employee had a "technical" education before his employment with Precision on April 1, 1942. He was first employed as a diemaker at an hourly rate. On October 2, 1942, effective October 5, 1942, he was made an assistant foreman and his pay increased to $70 per week. This employee received overtime pay up to October 3, 1942. This employee's salary was increased to $110.60 for a 63-hour week on March 27, 1943. He worked at Precision until September 25, 1943. The master found that after Magill became assistant foreman his work did not vary greatly from that which he was doing while he was paid at an hourly rate and from beginning to end of his employment he performed manual labor. It is plain the defendants here did not support their whole burden of proof in attempting to prove this employee was employed as an executive. Though again the master appeared to this court to be in error with his interpretation of requirement (f) of the "executive" regulation, I find on a review of the evidence that Magill performed work of the same nature as that performed by nonexempt employees and it exceeded 20% of the work performed in the workweeks in question by the nonexempt employees under his direction. This requirement lacking, Magill was not employed at Precision in an executive capacity. He was entitled to overtime on and after the date he became an assistant foreman, i. e., October 5, 1942.

Mixed or Special Employments.

 *Maude D. Parlin.* Rated as a "senior draftsman" in the engineering department and under the direct supervision of the chief engineer of the design of buildings. She was paid $65 a week from July 27, 1942, to the end of her employment February 13, 1943. Under a Precision "Schedule of Job Classification and Rates" adopted September 17, 1942, a senior draftsman was classified as entitled to overtime, with a weekly "A" rate of $48, a weekly "B" rate of $54, and a weekly "C" rate of $60. This employee was paid in excess of these rates, i. e., $65. Her duties were to prepare detail plans from original plans, to prepare sections, plans, and elevations; to design the arrangement in the case of reinforced concrete of the various members which were the components of the construction, and to prepare schedules of "bills materials" to be used in placing orders with suppliers for the various component parts as required. This employee was a graduate of M.I.T. with a degree of B.S. and an architect, and, as the master found, Precision "availed itself of Mrs. Parlin's professional training and experience and that Mrs. Parlin used her said professional training and experience in connection with her work at Precision." The master found Mrs. Parlin was employed in a professional capacity within the meaning of the regulation and not entitled to overtime. This finding was correct.

 *Edward J. Lawrence.* Studied economics at Villanova in 1923 and 1924; graduate of Brown University in 1928 (A.B.) after taking courses in economics and engineering. Employed by Precision as an administrative assistant in the personnel department on March 16, 1943 and paid $60 per week until the termination of employment on June 26, 1943. Lawrence sought out sources of skilled labor for Precision and conducted or assisted upon interviews with officials and prospective applicants. He reported upon such interviews and results obtained. Under the general direction of the Personnel Manager at Precision he worked upon an organization chart of the administrative department. He assembled data for a report to certain bonding and insurance companies interested in the extent to which Precision subcontracts had been completed. All of these activities were essentially independent activities, subject to only general supervision. The master found that this employee regularly and directly assisted an employee employed in a bona fide executive or administrative capacity as defined by the administrator under the Act; that the other requirements were present to make him exempt from the provisions of the Act as an administrative employee. This finding was warranted.

■ *Arthur L. Elliott.* On April 4, 1942, carried on payroll under general caption "Inspection" at $60 per week, later, effective October 26, 1942, increased to $100 per week. In 1942 executed employee rating reports as "foreman." An organization chart, dated March 1, 1942, shows Elliott with caption "Senior Tool Inspector" and employed directly under chief inspector and testing engineer. This employee supervised the work of the other tool inspectors at Precision. He reviewed work sheets prepared by other inspectors. He interpreted drawings and contacted the engineering department regarding interpretations. Elliott had charge of the tool inspection section of the inspection department at Precision. He often consulted with British inspectors and technicians in connection with his work. The nearest title descriptive of Elliott's work under the original schedule at Precision with a salary commensurate with that paid to Mr. Elliott is "Inspection Engineer." The master found Mr. Eliott was in no sense a simple tool inspector; that his actual position at Precision was broader and carried greater responsibilities. There is no need for further detail. The master found this employee's primary duty consisted of the management of a customarily recognized subdivision of Precision; that all the other requirements of the regulation were present to constitute this employee as employed in an executive capacity. The master is correct in all but requirement (f). Here I believe he again misinterprets the language of this subdivision of the regulation. However, I find, on a review of the evidence that the defendants have sustained their burden in proving that this employee did not perform work of the same nature as that performed by nonexempt employees that exceeded 20% of the number of hours worked in the workweeks in question by the nonexempt employees under his direction. This employee was employed in an executive capacity. He is not entitled to overtime.

■ *Emil Earl Leonard.* Graduate from N. Y. University with an M.E. degree; employed as assistant industrial engineer in the production department from February 16, 1943. His employment terminated June 26, 1943. He was engaged at Precision as a technical representative to assist the plant and factory manager. He was concerned with production difficulties that might be solved by procuring new tools or special tools or by repairing tools. He conferred with production foremen and members of the engineering department and reported to the plant manager. He was a "trouble shooter" and a "liaison man." All trouble with relation to tools was cleared through him. The testimony of this employee and others followed the same pattern. Their duties, according to them, were "routine duties," they were merely "errand boys"—always the tendency to "talk down" their jobs to escape the exempted class. There is little question that this man assisted an employee engaged in a bona fide executive or administrative capacity as defined by the regulation. He was employed in a bona fide administrative capacity within the meaning of the Act. The master was by no means clearly erroneous in denying this employee overtime compensation.

■ *Percy Lumsden.* Classified at Precision as a "senior process engineer" on November 22, 1942 with salary rates of $70, $80, and $90 per week. At Precision he worked under assistant chief engineers. The process work done by Lumsden consisted generally of writing out the steps of manufacture, designating any special tools required and adjusting the steps of manufacture to the equipment available. It was necessary for him to provide the sequence of operation and to specify the successive processes and specify the jigs, gauges, fixtures, and tools to be used. In connection with this process work it was necessary for the employee to have a knowledge of the steps and processes to be used upon manufacturing, to have knowledge of the jigs, gauges, fixtures and tools, special or otherwise, that would be necessary, and to have knowledge of the machinery and equipment available. The employee made suggestions to the assistant chief engineer with relation to changes upon the blueprints provided. A high degree of skill and judgment was necessary in connection with the work of the process engineer. This employee was paid on an hourly rate with overtime until October 12, 1942 when he was paid a weekly salary of $75 per week. Overtime

was allowed by the master until this employee received the classification "senior process engineer." From November 23, 1942 until the completion of his employment, overtime was disallowed on ground that the employee was employed in an administrative capacity in that he performed only under general supervision, responsible nonmanual office work directly relating to general business operations along specialized or technical lines requiring special training, experience and knowledge and requiring exercise of discretion and independent judgment. The evidence amply supports the master's finding with respect to Lumsden's work after November 23, 1942. I cannot find that the master is clearly erroneous in allowing this employee overtime compensation between October 12, 1942, to November 21, 1942. During this period Lumsden did not work as a senior process engineer and his work was not of a nature to justify a finding that during this period his duties as a whole were of such a nature to fulfill all the requirements of the definition. At any rate the government does not quarrel with this finding.

*Randall H. Fewell.* This employee went to work June 15, 1942 at Precision as an assistant buyer at $60 per week. He received his education at the University of Alabama and Rhode Island State College of Education. On October 10, 1942 Mr. Fewell's position was that of clerical superintendent with a salary of $70 per week and later he was changed, effective March 15, 1943, from the procurement department to the planning department, as clerical supervisor with no pay increase. This employee never functioned at Precision as an assistant buyer. The master divides his work in two periods: (1) From June 15, 1942, to March 13, 1943, and (2) from March 15, 1943, to June 26, 1943. In the first period he was first assistant to one Jennings, an engineer from D & Z who held the position of clerical supervisor until October, 1942, and thereafter senior administrative assistant, and later assistant to the director of procurement. Jenning's duties were to organize and supervise the clerical group in the procurement department and one of his main duties was to follow through purchase orders until the order was approved by the Navy and mailed to the vendor. This employee's duties were to follow through, under general supervision, the purchase order from the time the rough draft had been prepared by the individual buyer until such time as it was sent with the necessary blueprints to the vendor. He was responsible for the editing, to be sure that the correct terms, conditions, deliveries, quantities, and specifications were indicated on the purchase order. He checked the blue prints on the various plans to determine whether the quantities and descriptions were correct. He had special knowledge of British specifications and in the case of raw materials he checked the British material specifications against the purchase orders and in case of question he contacted the individual buyers directly. He had clerical and stenographic assistance. During this period the master correctly found this employee assisted an employee in a bona fide executive or administrative capacity within the meaning of the regulation. During the second period from March 15, 1943, to June 26, 1943, this employee was concerned with computing quantities of material and arranging for delivery of materials to subcontractors. After computations this employee made recommendations for the purchase of the material necessary for the fabrication of parts to Charles E. Busch who was employed in a bona fide executive capacity. The master's finding that Fewell during this period was an assistant to one employed in a bona fide executive capacity (Regulation § 541.2(b) (1) and employed in an administrative capacity was warranted by the evidence. This employee is not entitled to overtime during either period set forth. The argument of the plaintiff that his duties were routine and clerical is not convincing. This employee's work undoubtedly required the exercise of a substantial amount of discretion and independent judgment. His duties were far more than merely clerical. True he did some clerical work but it was purely incidental to his work in an administrative capacity. It would be difficult to conceive of any employee working in an administrative capacity who did not have to make some record concerning some aspects of his work.

There are some questions of fact and law remaining that require discussion.

### Employment Contracts.

[28] The master, having found that certain employees (Bacon, Heilpern, Wentworth, Dolan, Keane, Hasney, Barlow, LeBeau, and Cardinal) were entitled to overtime pay, computed the amounts. It is the contention of the plaintiffs that these computations were erroneous as a matter of law.

The master found as a fact that employees not classified in Precision's Schedule of Job Classification and Rates as subject to overtime were not paid overtime regardless of the workweek established for or worked by them. The employees just named in the preceding paragraph were not so classified. He also found that these employees accepted a regular workweek of forty-four hours up to January 18, 1943 and that thereafter they accepted a regular workweek of forty-eight hours. The plaintiffs concerned challenge this finding mainly on the following grounds: (1) The payroll records kept by Precision and (2) the statement of the president of Precision made to the Salary Stabilization Unit on March 20, 1943 and set forth below as respects the pay of foremen when the company decided to go from three to two shifts. The defendant Precision on the other hand contends the plaintiffs concerned were employed for unlimited workweeks. With this latter contention this court does not agree.

The job classifications and rate schedule classified these men as employed on a weekly basis and not entitled to overtime. The employee record signed by each employee and signed by a member of the personnel staff on behalf of the employer did not specify any definite workweek for any employee classified as not subject to overtime pay. The master found that each employee knew whether or not he was classified as an employee subject to overtime. It is true that salaried employees, up to January 9, 1943, appeared on the payroll records as having worked forty hours every week and plaintiffs argue this proves they were on a forty-hour week. Comptroller Rigg of Precision explained that the hours shown on the payroll for employees not subject to overtime were merely for reimbursement purposes from the Navy Department. Accepting the explanation of Mr. Rigg, which the master was justified in doing, the other facts surrounding the employment of the employees in question warranted the master in finding these employees knew or were told about the regular hours of work that were established when they accepted employment and they accepted these regular hours. The evidence shows the established hours of work were forty-four at that point. This finding can by no means be said to be clearly against the weight of the evidence after due consideration is given to the other contentions of the plaintiffs on this point.

On March 20, 1943, Precision made application by letter to the Salary Stabilization Unit of the Treasury Department for the purpose of increasing the pay of assistant foremen, foremen, and foremen group leaders. The first paragraph of the letter was as follows: "On September 17, 1942, this corporation had in effect a pay classification plan which we have been operating under up to the present time. This plan is based on a forty (40) hour week and compensation for both salaried and hourly employees was fixed on this basis." The plaintiffs argue that the company through its president who signed the letter, has stated "that all of the salaried as well as hourly rate employees *were* (italics mine) on a forty-hour basis, * * *." In the opinion of the court the president said no such thing. What the president did say was that the salary of the employees was *based* on a forty-hour week and compensation for both salaried and hourly employees was fixed on this basis. This letter does not demand the finding that all employees paid under this plan were on a forty-hour week. The master in his report correctly puts it this way: "It is one thing, however, to demonstrate that a particular salary was computed from a particular hourly rate and quite a different thing to establish an agreement to pay either an hourly rate or to pay sums in excess of that salary as overtime for hours worked over forty. One does not follow necessarily from the other."

The master in his report correctly points out the president did not state all the facts with relation to the forty-four and forty-eight hour workweeks established at Precision and that he did not touch upon the established and accepted practice of requiring a great majority of the salaried employees not classified as subject to overtime to adhere substantially to the forty-four and forty-eight-hour workweeks so established without any payments for hours over forty worked by them.

The plaintiffs point out nothing in this letter to support their contention that the master is in error with respect to the workweek of the plaintiffs-employees under discussion.

It is the further contention of the plaintiffs in certain cases where overtime was allowed that the master's findings in respect of the acceptance by plaintiffs of a forty-eight-hour week are erroneous as a matter of law. The weekly salaries of the employees concerned were not increased and it is argued that the effect of the increased workweek for these plaintiffs was to diminish their regular hourly rate of pay during each of the said forty-eight-hour weeks. We shall assume, arguendo, that this was a diminution of "Wage" within the meaning of Section 18 of the Act, 29 U.S.C.A. § 218. The plaintiffs argue that even if, as the master found, the plaintiffs accepted such a reduction, such acceptance would have been ineffective because such a reduction would have been illegal under the provisions of Section 18 of the Act, 29 U.S.C.A. § 218, which reads in part as follows: "No provision of sections 201–219 of this title shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under sections 201–219 of this title, or justify any employer in increasing hours of employment maintained by him which are shorter than the maximum hours applicable under such sections." Nothing in this provision outlaws agreements between employer and employee so long as Sections 6 and 7 of the Act, 29 U.S.C.A. §§ 206, 207, are not violated. Section 18 of the Act is merely "a warning to employers that the Act is not designed to lower wages or raise hours of employment because of the minimum or maximum established." White v. Witwer Grocer Co., 8 Cir., 132 F.2d 108, 111. Congress did not want any employer to rely on the Act as justification for reducing wages to minimum or increasing hours to maximum requirements. Cf. Missel v. Overnight Motor Transp. Co., Inc., 4 Cir., 126 F.2d 98, 107; Tinerella v. Des Moines Transp. Inc., D.C. 41 F.Supp. 798; and Remer v. Czaja, D.C., 36 F.Supp. 629.

In discussing the question just disposed or, i. e., the legality of the agreement whereby certain employees, allowed overtime, agreed to a change from a forty-four-hour to a forty-eight-hour week under Section 18 of the Act, this court assumed, although these employees were employed on a weekly salary basis, there was a diminution in "wage" within the meaning of Section 18 of the Act. In pressing the argument that the agreement to work a longer workweek was illegal, the plaintiffs concerned argue it was illegal and void within the meaning of Sections 4, as amended, and 5 of the Stabilization Act of 1942, 50 U.S.C.A.Appendix, §§ 964, 965, and Executive Order No. 9250, 50 U.S.C.A.Appendix, § 901 note. I do not agree. Whatever the meaning of "wage" is in Section 18 of the Fair Labor Standards Act where overtime is computed on an hourly basis, surely, under the Stabilization Act of 1942, it cannot be successfully argued there was any diminution in salary. The salaries of these employees remained the same after their agreement to accept the forty-eight-hour week.

All of the objections to the master's report which merit discussion have been dealt with in this opinion. The findings of fact made by the master, except when I have substituted my own for his, or made an additional finding, are adopted as my findings of fact. I find none of the findings adopted by me against the clear weight of the evidence so that they can be termed "clearly erroneous." Rule 53(e) (2), F.R.C.P. Also I have substituted my rulings of law for those of the master which I believe to be error.

With the modifications made, the objections of the parties are overruled, and the master's report is confirmed.

Judgment accordingly, which will include the master's computation of overtime allowed, an additional equal amount as liquidated damages, costs, and an attorney's fee of $1250.