**WELLS et al. v. RADIO CORPORATION OF AMERICA.**

Civ. No. 34-491.

District Court, S. D. New York.

May 20, 1948.

Neuburger, Shapiro, Rabinowitz & Boudin, of New York City (Victor Habinowitz and Belle Seligman, both of New York City, of counsel), for plaintiffs.

Cahill, Gordon, Zachry & Reindel, of New York City (Paul W. Williams and Kenneth D. Wallace, both of New York City, of counsel), for defendant.

MEDINA, District Judge.

This is an action to recover overtime compensation, liquidated damages, and attorney's fees alleged to be due by reason of the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b). Pursuant to pre-trial order the issues now before the Court concern only the question of whether or not plaintiffs were properly classified as exempt, and whether defendant had relied on any administrative regulation, order, ruling, approval or interpretation of any agency of the United States, as provided in Section 9, or acted in good faith and with reasonable grounds as provided in Section 11 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. §§ 258, 260.

The controversy has its focus in the Camden, New Jersey, plant of defendant; and covers the period from January 15, 1940 to January 15, 1946. As a manufacturer of practically every type of electronic device, defendant was engaged in an exacting and intricate business. Its precision products were of the most diverse character and the increased demands of war production made it necessary not only to develop a highly efficient organization but also to train the most experienced and capable of its technical employees for a large number of specialized functions, all of which required the exercise of judgment and discretion, as will appear more fully in connection with the discussion of the particular work done by the various plaintiffs.

It would serve no useful purpose to set forth in detail the elaborate organization developed by the Company for the purpose of personnel classification. It was essential that accurate occupational definitions be made, that the classification of groups of employees as exempt or nonexempt be determined, and that all this be done with complete fairness to the employees. The morale and efficiency of the plant depended in no small measure upon the skill and fair-mindedness of the men to whom this task was entrusted. Several of these men testified to the manner in which the occupational definitions were developed and the procedure of classification for exemption status; some of the Job Analysis Schedules, prepared for purposes of checking, were "reviewed" by some of the plaintiffs in this action.

In 1944 and 1945 an investigator of the Wage and Hour Division of the Department of Labor, accompanied by various assistants, visited the Camden plant and made an extensive study to determine whether the employees were being and had been properly paid and to check the classification of employees as exempt or not exempt. Several of plaintiffs were individually interviewed. The result of this investigation was that certain recommendations were made relative to amounts found for one reason or another to be due to various employees. The Company made these payments. No such recommendation

was made concerning any of these plaintiffs.

As a practical matter the Company executives may well have regarded this investigation and its result as more or less giving the plant a clean bill of health. There is, however, no proof of any "regulation, order, ruling, approval or interpretation," within the meaning of Section 9 of the Portal-to-Portal Act of 1947.

The "approvals" by the Salary Stabilization Unit of the Treasury Department fall into a different category. The first of these which related to any of these plaintiffs was approved on February 18, 1943. The job definitions had previously been filed with the Salary Stabilization Unit. This approval included increases in rates of pay to Armstrong, Deichert, Waddell and Wells as Cost Estimators. The approval on March 18, 1944 included all the plaintiffs, although they were not specifically mentioned by name. In each of these approvals it was necessarily found and decided that these men were properly placed in the exempt class. That the Company relied upon these approvals is self-evident; and the testimony is to the effect that it did so.

■ The jurisdiction of the Salary Stabilization Unit at the time of the approvals above referred to was defined by Section 1002.10 of the Regulations of the Commissioner of Internal Revenue (1A C.C.H. Lab.Law Serv. p. 14008) as confined to cases where the rate at which the salary, exclusive of bonuses and additional compensation and without regard to the contemplated adjustment, computed on an annual basis, is: (1) In excess of $5,000 per annum, in the case of individuals employed in any capacity whatsoever; and (2) $5,000 or less per annum, in the case of individuals (i) who are employed in bona fide executive, administrative or professional capacities, and (ii) who in their relations with their employer are not represented by duly recognized or certified labor organizations, and (iii) whose services are not within the meaning of agricultural labor as defined in Section 4001.1(1) of the General Regulations. Accordingly, in approving the applications of the Company for the above described increases in rates of pay, the Salary Stabilization Unit necessarily decided that each and every one of these individuals, each of whom was in the "$5,000 or less per annum" class, was employed in a bona fide executive or administrative capacity, and that each was properly classified as an exempt employee. Such a "ruling," thus relied on, constitutes, with respect to the period of time subsequent to the respective "approvals," a defense within the meaning of Section 9 of the Portal-to-Portal Act of 1947, as it will be found that the act of classifying each of the plaintiffs as exempt was done in good faith.

The proof of good faith by the Company is overwhelming. Not a scintilla of credible testimony was adduced to the contrary. The testimonial and documentary evidence on this somewhat lengthy trial revealed no single suspicious circumstance or any other proof of an attempt to deprive an employee of his just compensation by the use of an inaccurate and high-sounding title for a purely routine or manual job.

There are forty-one plaintiffs. Each case must stand on its own footing, as if each individual plaintiff had brought a separate action. The classifications involved include Process Engineers, Manufacturing Development Engineers, Time Study Engineers, Cost Estimators, one Manufacturing Problem Analyst, Foremen and Assistant Foreman. Where the classifications had a junior and senior grade, as with the Process Engineers and others, the plaintiffs are all seniors. Many of them fall in various classifications for different parts of the period in suit. In many instances the plaintiffs testified in their own behalf but as to most of them it is necessary to rely exclusively on the testimony of others; and it is pleasing to record the circumstance that the testimony of both plaintiffs' and defendant's witnesses, with a few notable exceptions in the case of certain of the plaintiffs, was candid and satisfactory.

Every possible effort has been made to give consideration to the proof relative to each individual plaintiff, including the special situations where it was claimed that for a certain period of long or short duration one or another of plaintiffs had done work of a character different from what

968

was described generally in his occupational definition. Much time was consumed in argument and discussion during the trial simply for the purpose of bringing into sharp relief the proofs as they related to each of the forty-one men involved.

The factual conclusions arrived at and briefly hereafter discussed are based upon a consideration of the evidence as a whole. In many instances the testimony of various plaintiffs has illuminated the general picture and, in the case of those plaintiffs who did not testify, it would be a mistake to infer that the findings are based solely upon the testimony of defendant's witnesses as to what was done generally by employees in certain job classifications.

### Process Engineers in General

■ The Process Engineers form the largest group of plaintiffs. Upon receiving the blueprint and a request for a process it was the duty of these men to fill out a Process Manufacturing Form, which included a certain amount of data which an experienced process man could obtain by inspection, the use of available books and by consultation with others. Their chief function, however, was to determine the most economical method of manufacture consistent with the quantity and quality required and to specify in order the exact sequence of the operations to be performed, with a designation of the tools, machine equipment and labor classification to be used in each operation. It was their duty and responsibility to specify the material for ordering purposes and, if some tool not already available was needed to reduce the expense of manufacture to a minimum, to describe the tool and to suggest changes in design or tolerances where the specifications required a method of manufacture more expensive than the circumstances warranted. To do all this required a wealth of experience, a knowledge of cost, an ability to discriminate between the various machines capable of doing each operation so that the one which could do the work in the desired quantity at the least expense per unit should be selected, and a knowledge of the cost of setting up each machine in readiness for the operator. When the process reached the production floor, it was also the duty of the process engineers to see whether the work of operation was over or under the estimated average and make any changes in the process which the varying conditions of operation might make desirable. There was a small amount of supervision, the work was concededly non-manual, it was directly related to management policies or general business operations along specialized or technical lines requiring special training, experience or knowledge, and it plainly required the exercise of discretion and independent judgment. As the salary range was well above the required minimum, I find that the process engineers in general were properly classified as exempt within the meaning of Wage and Hours Division Regulations, Sec. 541.2 (B2), as administrative employees. Dolan v. Day & Zimmerman, D.C.Mass.1946, 65 F.Supp. 923.

It is of no significance that there was a certain amount of specialization among Process Engineers. Some worked almost exclusively in writing processes for the machine shop, others for gas welding, sheet metal, finishing, coils, capacitors, transformers and so on. In many instances there was a certain amount of repetition and process cards were duplicated, with one or two blanks to be filled in. Doubtless some of the Process Engineers were more experienced and more capable than others; but their duties and responsibilities were identical in substance.

### Archer, Emmons, Foster, Jordan and Maska

■ These men require separate consideration. Archer and Emmons were classified as Manufacturing Development Engineers and the rest as Process Engineers while doing work of the character about to be described. The difference in classification is understandable under the circumstances and is of no significance, as they all did work of the same character. They are here discussed together because Archer and Emmons differed from the other Manufacturing Development Engineers in that only these two had the authority to change and rewrite processes on the production floor.

The occasion for the formation of this group was that there was so much trouble with process cards in the multifarious and complicated operations of the Company that it became necessary to delegate these men and others to go to places where trouble developed, take the blueprint and the process cards, discover what was wrong and proceed to remedy it by making such changes as they thought should be made. There is no reason to doubt that they had the knowledge and experience and did the work of Process Engineers.

In addition to the duties above described they occasionally wrote processes. It was not their main function to write processes, however, and the difficulty is that, despite the fact that they had desks just as did the other Process Engineers and did a considerable part of their work at these desks, they were on the production floor a great deal of the time. For this reason it is claimed that they cannot be found exempt under B(2), which applies only to those performing "office or field work." I cannot agree with this contention. There is no basis for any distinction in classification between these men and the other Process Engineers. Accordingly, I find them properly classified as exempt within the meaning of Wage and Hour Division Regulations, Sec. 541.2(B2), as administrative employees

### Manufacturing Development Engineers

■ The men in this classification fall into three distinct categories. Pearsons, Kuni and Jones were known as "factory engineers." They were clearly office workers. They worked on blueprints and drawings with the Design Engineers as the latter frequently had little shop background and were not sufficiently familiar with production problems. They suggested changes in design or substitution of material to facilitate manufacture and in general reviewed and approved the blueprints and drawings to eliminate production problems. Their recommendations played an important part in the development of new equipment. That their work involved discretion and judgment was not seriously questioned. I find that these men were properly classi-

fied as exempt within the meaning of Wage and Hour Division Regulations, Sec. 541.2 (B2), as administrative employees.

■ The tool group consisted of Ertner, Maska, Reinschreiber and Pascal. Their work was such that they seem clearly in the general area of administrative employees but the difficulty is whether they should be classified under subdivision B(1) or B(2) or B(3).

It was the duty of these men, who were employed in different parts of the plant, to see that the tools were in every respect proper to use in production. In many instances the inspection and try-out of a particular tool proved that it was satisfactory in every way. On the other hand, there were numerous instances in which difficulty with the tool developed. It was the duty and responsibility of these men to ferret out at the initial stage of production any discrepancy which might exist within the tools, decide how the defect should be remedied and have immediate corrections made. In case an error of importance was discovered, it was also the duty of these men to charge the error to the proper department, i. e., processing group, tool design or the tool shop. In some instances they determined that the trouble was caused by improper sequence of operations, the fault of the set-up man in preparing the machine for the particular operation or lack of skill on the part of the operator; and in each case they gave the necessary directions to eliminate the difficulty. While the work of each individual in this group differed somewhat from the work of the others, the execution of their respective special assignments necessarily involved judgment and discretion of a high order. On the other hand, they did not work at desks as did the Process Engineers and others, but at tables which were set up on the production floor. These tables were furnished with a ridge running around three sides so that the blueprints and other papers would not fall on the floor and they were provided with a drawer in which the men sometimes kept their tools such as calipers, micrometers and so on. Ertner, Maska and Pascal reported to Binder as their supervisor and Reinschreiber reported to Roth. Perhaps they might be regarded as "assistants" un-

der subdivision B(1) as both Binder and Roth were undoubtedly "employed in a bona fide executive or administrative capacity" and the work was largely, although not exclusively, non-manual. Cf. Dolan v. Day & Zimmerman, D.C.Mass.1946, 65 F.Supp. 923, 933. They might, perhaps, properly be classified under subdivision B(2) although their "office" work was on the production floor rather than in a room which might more appropriately be called an "office," and despite the fact that they used the tables above described rather than desks.

· The most appropriate subdivision, however, seems to be subdivision B(3) as they were performing special, non-manual assignments and tasks directly relating to management policies or general business operations involving the exercise of discretion and independent judgment.

As the salary range was well above the required minimum, I find that the Manufacturing Development Engineers were properly classified as exempt within the meaning of Wage and Hour Division Regulations, Sec. 541.2(B2) or (B3), as administrative employees as respectively above indicated.

■ Chilcott worked in the finishing department. From September 15, 1942 to April 16, 1943 he was classified as a Manufacturing Development Engineer. There is little difficulty with the greater part of his work, which had to do with a number of special assignments, the most important of which related to an ATB Air Corps transmitter. He also spent considerable time in writing standard finishes and developed and supervised the installation of a method of using hot tin dipping pots. All of this was done under only general supervision. As the salary range was well above the required minimum, I find that he was properly classified as exempt within the meaning of Wage and Hour Division Regulations, Sec. 541.2(B3).

■ Another phase of Chilcott's work, however, required a careful analysis of the proof and in this connection his testimony was transcribed and studied. He insisted that, when he first reported to Mr. Quick as supervisor of "manufacturing methods," he was assigned for a period of at least six weeks to the clerical task of copying certain figures from the process cards of parts which had been manufactured in the special apparatus division for the radio apparatus division and tabulating these figures on a chart or charts. This was undoubtedly work which would ordinarily be done by non-exempt cost clerks. He further testified that he did this in July and August, 1942, under the direction of Mr. Quick; and he explained the fact that he was then still classified as an Assistant Foreman by stating that some time must have elapsed between the occasion of his transfer to Mr. Quick's department and the time of the transfer of his time card and payroll record. There is nothing improbable about this testimony. Unfortunately for the defendant, Mr. Quick was no longer in the Company's employ and was not available as a witness; nor did any of the other witnesses for the defendant give any testimony which cast any light upon the subject. Despite the fact that some of Chilcott's testimony as to the doing of manual work as an Assistant Foreman was exaggerated and his recollection in some respects faulty, he made a generally good impression. Accordingly, as to the period of six weeks just prior to September 15, 1942, I find that defendant has not sustained the burden of proving that Chilcott was properly classified as an exempt executive or administrative employee.

## Time Study Engineers

■ Archer, Burton, Campbell and Markowski were Time Study Engineers for a portion of the period under consideration. None of them testified, as it was conceded that the description of their duties as given by defendant's witnesses was substantially accurate. These men were in no sense rate setters or mere time checkers. They were required to have an extensive knowledge of manufacturing processes and procedures, tools and equipment, together with analytical ability and judgment. Their most important function was to establish a proper rate for each operation and they were solely responsible for fixing incentive rates. In making these calculations they were required to take into consideration many variables, including the psychology of the indi-

vidual worker and differences in speed and skill when under close observation. They could change a method of operation and often made suggestions. It was also their duty to make a careful check of the time of various operations in connection with the proposed purchase of new equipment, in order to ascertain whether any significant saving was likely to result. They had a more direct relationship to the operators than did the other plaintiffs, because a substantial proportion of employee grievances had to do with the incentive rates fixed by these Time Study Engineers. Their salary range is almost the same as that of the Cost Estimators and within a few dollars of that of the Process Engineers. They performed under only general supervision responsible non-manual office work, directly related to management policies or general business operations, along technical lines requiring the exercise of discretion and independent judgment.

As the salary range was well above the required minimum, I find that the Time Study Engineers were properly classified as exempt within the meaning of Wage and Hour Division Regulations, Sec. 541.2(B2), as administrative employees.

### Cost Estimators

 Archer, Armstrong, Deichert, Jordan, Kuni, Dugan, Waddell and Wells were Cost Estimators (product) and Chew was a Cost Estimator (tools). Cost Clerks and Material Clerks were provided to do a large proportion of the purely clerical work. The Cost Estimators acted only under general supervision. They did no manual work and they were office workers in every sense. It was their duty and responsibility to assemble, correlate and interpret all the data necessary to estimate cost; they were also required to take into consideration the type of tool needed for the particular quantity, the scheduled rate of delivery for the particular job involved and to check to make sure that the necessary facilities were available inside the plant or elsewhere. Their conclusions and recommendations were used in establishing sale prices, in making decisions as to whether or not the Company would manufacture certain articles, in submitting or considering bids, and in cost ac-

counting. At times a few of them were called upon to make field trips with other representatives of the Company.

The estimates, which were described as Cost Indications, Class A Estimates and Class B Estimates, varied in complexity and in the amount of discretion and judgment which were required. While some were easier than others, the Cost Estimators were required at all times to bring into play their judgment, experience and production knowledge. Their work directly related to management policies or general business operations along technical lines.

As the salary range was well above the required minimum, I find that the Cost Estimators were properly classified within the meaning of the Wage and Hour Division Regulations, Sec. 541.2(B2) as administrative employees.

### Dugan, Archer and Kuni

 Despite the fact that some of the exhibits showed that Dugan had worked upon Cost Indications and Kuni testified that he worked on Class A as well as Class B Estimates during the early part of their service as Cost Estimators, it was earnestly argued that the testimony of defendant's witness O'Shea, the man in charge of the cost estimating group for the entire Camden plant, established the fact that these three men had, during approximately their first six months as Cost Estimators, worked exclusively on Class B Estimates, which was chiefly if not entirely routine work. As my notes were not clear on the point, O'Shea's testimony was transcribed and studied and it was found that the basis for the contention was in the recitals in counsel's questions rather than in O'Shea's answers, which were generally to the effect that these men worked during this period either exclusively on Class A Estimates or on both Class A's and Class B's. It will accordingly be found that they were properly classified as exempt administrative employees for the entire period of their service as Cost Estimators.

### Manufacturing Problem Analyst

 Karr was the only Manufacturing Problem Analyst. He did not testify and no serious attempt was made to dispute the

fact that he was properly classified as exempt as an administrative employee. He was evidently a man of unusual talents and training. He was given the special assignment of locating and remedying the difficulty when it appeared that something had been omitted from a drawing, or the process was in some way defective or the Purchasing Department had bought a part which did not perform its function. Wherever it was necessary to make an assessment of excess charge against a certain department, his decision was final. While he spent about 25% of his time in the office and the balance on the factory floor, this is a circumstance without significance.

As with Ertner, Maska, Reinschreiber and Pascal, Karr might be classified as exempt under subdivision B(1) or B(2) or B(3). He seems clearly to fall under both B(2) and B(3).

He performed under only general supervision responsible non-manual office work and special non-manual assignments and tasks directly related to management policies or general business operations along technical lines involving the exercise of discretion and independent judgment.

As his salary range was well above the required minimum, I find that Karr as Manufacturing Problem Analyst was properly classified as exempt within the meaning of Wage and Hour Division Regulations, Sec. 542.2(B2) and (B3), as an administrative employee.

### Foremen and Assistant Foremen

Bertolini, Jones, Kuehner, Kuni and Simpson were Foremen and Chilcott, Devlin, Haywood, Hofstetter, Jones, Karr, Kerbaugh, Kuni and Patterson, Assistant Foremen for various periods, most of which were of relatively short duration. Maska also was classified for about six months as an Assistant Foreman, but this seems to have been an error in classification, as I accept his testimony that he was a "development man" and never worked as an Assistant Foreman. This error in classification does not, however, affect his status.

The duties and responsibilities of Foremen and Assistant Foremen were the same throughout the plant; and the only distinction between the two is that, whereas the Assistant Foremen had substantially the same duties and responsibilities as the Foremen, they reported to Foremen and were generally men of less experience and a shorter tenure of service with the Company. The occasion for a differentiation was largely because there were night and day shifts and because the number of employees in some sections of the plant was so large that a single foreman could not handle the necessary supervision. The Foremen and Assistant Foremen assigned the work to the operators, made sure that the necessary schedules were maintained, checked the product for quality and generally saw to it that the Company's policies were maintained. Each of them did a certain amount of manual labor in demonstrating to the operators how the work was to be done. Each of them had the authority to make suggestions and recommendations as to hiring or firing and these suggestions and recommendations, as well as those relating to advancement and promotion or other changes of status of other employees, were given particular weight. That they customarily and regularly exercised discretionary powers was scarcely disputed.

As has proved to be the case with so many of these actions under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., the chief area of conflict in the testimony had to do with the suggestions and recommendations for hiring or firing on the one hand and the amount of manual labor performed by the men on the other.

While it is easy to understand how an employee in retrospect and after the lapse of years can come to think of himself as having performed a large amount of manual labor, testimony of this character is necessarily unreliable. None of these plaintiffs had any records or memoranda with which to refresh their recollection. Their regular non-manual duties, including a certain amount of demonstrating, were such as necessarily to take up all or almost all of their time. There were stock men available at much less expense to the Company to move hand trucks, carry tote pans and tools and fetch parts which were needed on the production line. The rules of the union forbade the performance of any man-

ual labor by the Foremen and Assistant Foremen, who worked under the constant surveillance of union shop stewards, alert to complain about just such irregularities. The testimony of defendant's witnesses on the other hand impressed me as free from exaggeration and entirely in conformity with the probabilities of the situation.

On the subject of hiring and firing it generally developed that the denials by plaintiffs that they had such authority rested upon mental reservations of one kind or another. In any event, the mere fact that some of the Foremen and Assistant Foremen had no recollection of making recommendations of this character for considerable periods failed to convince me that they had no authority to do so, in the face of the most positive and satisfactory testimony that the authority of the Foremen and Assistant Foremen in this regard was entirely uniform throughout the plant. Most of the plaintiffs who testified gave abundant support to this proof of the uniformity of the Company's policy and its general instructions and practices on this point.

I find that the defendant has sustained its burden with respect to each and every one of the subdivisions of Wage and Hour Division Regulations, Sec. 541.1, and that the Foremen and Assistant Foremen were all properly classified as exempt executive employees within the meaning of said Sec. 541.1.